# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

FELIPE ANNEZ BENTLEY,

        Defendant-Appellant.

UNPUBLISHED
February 20, 2018

No. 334632
Wayne Circuit Court
LC No. 15-006152-01-FC

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DEMI LASHELL HENRY,

        Defendant-Appellant.

No. 334881
Wayne Circuit Court
LC No. 15-005678-01-FC

Before: GLEICHER, P.J., and BORRELLO and SWARTZLE, JJ.

PER CURIAM.

Following a second joint trial, a jury convicted defendants Felipe Annez Bentley and Demi Lashell Henry of several charges arising from a shooting incident. Defendants' first trial ended when the court declared a mistrial during jury deliberations. Defendants contend that their retrial violated Double Jeopardy principles, as no manifest necessity justified the mistrial. We agree, and reverse defendants' convictions.

## I. BACKGROUND FACTS AND PROCEEDINGS

The prosecution charged both defendants with assault with intent to commit murder and several weapons offenses. The cases were consolidated for a single trial. The jury began to deliberate at 1:30 p.m. on Wednesday, November 18. As its first order of business the next morning, the trial court took the bench, summoned the jury, and declared a mistrial based on a note received from a juror.

-1-

The court prefaced its mistrial ruling by expressing great disappointment that a juror had ignored the court's instructions and spoken to a party. The court claimed that it could not invade the sanctity of the jury by questioning its members:

> Once a jury begins their deliberations, and this system has been in existence for over 800 years, the jury cannot be disturbed. No inquiry can be made of the jury. In other words, no questions can be asked of the jury. No suggestions can be made to the jury. You are in a sanctum sanctorum. In latin [sic], it means the holy of holies.

The judge then announced that it could not permit additional deliberations, "for it may be an injustice to either side." The court continued, "I do not know as to who would be prejudiced by these communications. And because of that I'm forced, as much as I hate to do it, to declare a mistrial in regard to this matter."

After the jury was excused, both defendants objected to the mistrial. The court found these objections "empty" and "ludicrous."

The note that precipitated the mistrial was written by juror DK. It stated:

> Your honor – I was made aware by another jury member that one of our jury members talked to Ms. Henry before the trial. She was telling her, "I hope I get you on my trial because you are such a nice girl." I can't remember her name but she is an older black woman with blond hair. I strongly believe this is affecting her decisions.

After declaring the mistrial, the court questioned DK on the record, although she was not placed under oath. DK explained that when the jury's deliberations concluded the preceding afternoon, she and another juror, TH, waited together for rides home. Their conversation turned to the behavior of a third juror, C. DK and TH observed that during the deliberations, C folded her arms and sat back. The court suggested "That one juror was obstreperous?" DK agreed, elaborating that C "was convinced one way and refused to even listen to anything we said."

DK volunteered that she had become upset and "was a little boisterous in there trying to understand why this person felt this way and was not even going to listen to anything we said because of that." During their chat while awaiting rides home, TH advised DK that he "seen [C] talking to Ms. Henry, and she said you're a very nice girl, and I hope you get on my trial." DK described the juror who engaged in the conversation as being "a little older. . . . She's one of the older women." The judge continued to question DK, who reiterated that her information about C had come from juror TH, who in turn had represented that C had spoken to defendant Henry "before the trial."

The court offered defense counsel an opportunity to question DK; both declined. One defense attorney observed, "You've already granted the mistrial." After DK was excused, counsel and the court turned to a discussion of scheduling the new trial. The court then summoned defendant Henry to the front of the court, and the following colloquy ensued:

*The Court*:  Ms. Henry, it's evident to this Court that the reason that we had to grant a mistrial in regard to this case was because your continued attempted communication with the jurors in regard to this case.  You're remanded.

*Defendant*:  Judge - -

*The Court*:  I'm pulling the [bond].

*Defendant*:  Can I have a say?  Can I speak, please, say a word?

*The Court*:  Beg your pardon?

*Defendant*:  Can I please say a word?

*The* Court:  Well, sure you can.  Go ahead.

*Defense Counsel*:  You shouldn't talk about this right now.  You can talk about yourself, but not about what just happened.  That's my legal advice to you.

*The Court*:  You're remanded.  Take her away.

*Defendant*:  That lady never said a word to me.

Both defendants filed motions seeking to dismiss the charges against them on double jeopardy grounds.  The court denied the motions and the retrial commenced in May 2016.  The jury acquitted defendants of assault with intent to murder and convicted them of the lesser included offense of assault with intent to do great bodily harm.  The jury also convicted defendants of several weapons-related offenses.

Defendants appeal, invoking the constitutional guarantees against double jeopardy.

## II. DOUBLE JEOPARDY

## A. LEGAL PRINCIPLES

The Double Jeopardy Clauses of the United States and Michigan Constitutions provide that no person shall "twice put in jeopardy" for the same offense.  US Const, Am V; Const 1963, art 1, § 15.

> The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, . . . as well as enhancing the possibility that even though innocent he may be found guilty. [*Green v United States*, 355 US 184, 187-188; 78 S Ct 221; 2 L Ed 2d 199 (1957).]

In a jury trial, jeopardy attaches when the jury is impaneled and sworn. *People v Mehall*, 454 Mich 1, 4; 557 NW2d 110 (1997). Once jeopardy attaches, "the defendant has a constitutional right to have his case completed and decided by that tribunal." *People v Henry*, 248 Mich App 313, 318; 639 NW2d 285 (2001) (quotation marks and citation omitted). Unless the defendant consents to the trial's interruption or a manifest necessity compels a mistrial before a verdict is reached, the defendant cannot be brought to trial again. *Mehall*, 454 Mich at 4.

The "manifest necessity" standard is at the heart of this case. The "necessity" portion of the term is not to be applied literally; "contrary to the teaching of Webster, we assume that there are degrees of necessity and we require a 'high degree' before concluding that a mistrial is appropriate." *Arizona v Washington*, 434 US 497, 506; 98 S Ct 824; 54 L Ed 2d 717 (1978). A mistrial premised on a manifest necessity does not bar a retrial. *People v Echavarria*, 233 Mich App 356, 363; 592 NW2d 737 (1999).

The contour of an appellate court's "manifest necessity" review of a mistrial ruling depends on the circumstances. At one extreme, we afford "great deference" to a trial court's decision that a jury is deadlocked. *People v Lett*, 466 Mich 206, 220; 644 NW2d 743 (2002). At the opposite pole are cases in which "the prosecutor requests a mistrial in order to buttress weaknesses in his evidence." *Washington*, 434 US at 507. The "strictest scrutiny" is required in such cases. *Id*. at 508. This case falls in between. There was no evidence that the jury was deadlocked. They had deliberated for less than four hours and the foreperson had not advised the court of any difficult in reaching a verdict.

In *Washington*, the trial court declared a mistrial when the defendant's attorney accused the prosecutor of having hidden evidence during the defendant's first trial. The court believed that counsel's improper comment created a risk of antiprosecution bias. *Id.* at 499. The Supreme Court held that the judge's decision was entitled to great deference:

> In a strict, literal sense, the mistrial was not "necessary." Nevertheless, the overriding interest in the evenhanded administration of justice requires that we accord the highest degree of respect to the trial judge's evaluation of the likelihood that the impartiality of one or more jurors may have been affected by the improper comment. [*Id*. at 511.]

Nevertheless, the Supreme Court emphasized that before declaring a mistrial, a trial judge " 'must always temper the decision whether or not to abort the trial by considering the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate.' " *Id*. at 514, citing *United States v Jorn*, 400 US 470, 486, 91 S Ct 547; 27 L Ed 2d 543 (1971). Therefore, the reviewing court must consider whether a trial judge exercised " 'sound discretion' " in declaring a mistrial. *Washington*, 434 US at 514.

In *Washington*, the Supreme Court offered a relevant example of a decision not worthy of deference: a mistrial ruling made by a judge who "acts irrationally or irresponsibly." *Id*. The trial court in *Washington* was not guilty of such conduct, the Court explained, as the judge "did not act precipitately in response to the prosecutor's request for a mistrial," and gave both sides a "full opportunity to explain their positions on the propriety of a mistrial." *Id*. at 515-516.

Because the judge exercised "sound discretion" in the face of possible juror bias, the Supreme Court held that the mistrial was supported by the " 'high degree' of necessity which is required in a case of this kind." *Id*. at 516.

## B. WAIVER

Before analyzing whether a manifest necessity for a mistrial existed in this case, we must first address the prosecutor's claim that defendants waived their double jeopardy challenge by twice moving for a mistrial during their first trial. "Retrial is permissible when a defendant consents to a mistrial because such consent constitutes a waiver of a double jeopardy claim." *People v Tracey*, 221 Mich App 321, 328; 561 NW2d 133 (1997). However, a defendant's earlier request for a mistrial does not amount to consent for the court's later declaration of a mistrial when the defendant's motion is based on different grounds. See *United States v Byrski*, 854 F2d 955, 961 n 10 (CA 7, 1988); *State v Stevens*, 126 Idaho 822; 892 P2d 889 (1995); *State v Bernard*, 133 NH 843; 587 A2d 1219 (1991); *Medina v State*, 432 So 2d 76 (Fl Ct App, 1983). A waiver must be based on " 'an intentional relinquishment or abandonment of a known right or privilege.' " *Brewer v Williams*, 430 US 387, 404; 97 S Ct 1232; 51 L Ed 2d 424 (1977), quoting *Johnson v Zerbst*, 304 US 458, 464; 58 S Ct 1019; 82 L Ed 1461 (1938). By moving for a mistrial on grounds unrelated to the juror's note, defendants did not waive their right to object to a mistrial granted on that basis.

Henry first sought a mistrial when the prosecution presented a witness's preliminary examination testimony because the witness could not be located to testify at trial. The witness had testified at separate preliminary examinations for Henry and Bentley. Henry contended that although redacted, the testimony from Bentley's preliminary examination was prejudicial to her. Defendants' second mistrial motion alleged that the prosecution had not provided them copies of reports regarding testing of the weapons taken into custody. Bentley's counsel also noted that the prosecutor had not produced information gleaned from a canvass of the neighborhood. They further supported the motion by citing the prosecutor's violation of Bentley's right to remain silent.

These alleged errors occurred earlier in the trial. Defendants' motions were properly denied, and the trial continued.

As a trial evolves, a defendant's interest in a mistrial may wax or wane.

[D]eciding whether to seek a mistrial (or whether to accept or reject a mistrial offered by the trial court) involves an on-the-fly balancing of the probable damage caused by the trial error against the likelihood that a different jury might be more inclined to acquit—a question that itself requires considering how receptive the current jury is to the defendant, whether key witnesses have testified as anticipated, etc." [*United States v Chapman*, 593 F3d 365, 368 (CA 4, 2010).]

Here, defendants did not renew their previous mistrial motions after the jury was instructed. Whatever interest they had in a mistrial had evidently faded before the jury began to deliberate.

The trial court's sua sponte mistrial declaration arose from circumstances completely unrelated to defendants' motions. Both defense attorneys objected to the trial court's mistrial

decision. Given these facts, defendants did not consent to the trial court's ultimate mistrial declaration. See *Bernard*, 587 A2d at 1225. And we decline to adopt a rule foreclosing a double jeopardy challenge whenever a defendant advances an unrelated, unsuccessful mistrial motion during a trial. Because defendants did not consent to the mistrial that the trial court declared, or waive their rights to challenge the retrial or the basis for the mistrial on double jeopardy grounds, we turn to whether the mistrial was required by "manifest necessity."

## C. MANIFEST NECESSITY

Guided by *Washington*, we first consider the level of deference due to the trial court in this case. The problem presented in *Washington* was occasioned by defense counsel's opening statement and the trial court's concern that an improper argument made a fair verdict impossible. Somewhat similarly, the trial court in this case expressed concern that a juror's contact with a defendant constituted juror misconduct or resulted in juror bias. In *Washington*, the Supreme Court analogized the problem presented to that of a deadlocked jury, elaborating that "along the spectrum of trial problems which may warrant a mistrial and which vary in their amenability to appellate scrutiny, the difficulty which led to the mistrial in this case also falls in an area where the trial judge's determination is entitled to special respect." *Washington*, 434 US at 510.

Despite the Supreme Court's characterization of its review as "special respect," the Court examined in detail whether the trial court's decision had been sound. *Id*. at 514. The Court pointed out that the trial judge had not acted in haste, had entertained feedback from counsel, and withheld its ruling for a day to allow counsel to refine their positions. The Court summarized, "We are therefore persuaded that the trial judge acted responsibly and deliberately, and accorded careful consideration to respondent's interest in having the trial concluded in a single proceeding." *Id*. at 516.

The facts of *Washington* stand in stark contrast to those presented here. Even applying exactly the same level of deference as did the Supreme Court in *Washington*, we conclude that the trial court did not exercise sound discretion in ordering the mistrial.

A trial court exercises sound discretion when it approaches a problem deliberately, rationally, and responsibly. See *Johnson v Karnes*, 198 F3d 589, 596 (CA 6, 1999). Here, the trial court acted precipitately. The judge failed to express any concern for the consequences of an abrupt mistrial decision, and afforded counsel no opportunity to weigh in on the subject. While juror bias is a legitimate basis for a mistrial decision, the trial court declared a mistrial without conducting any investigation of the facts before it pulled the trigger, and gave no heed to possible alternatives to dismissing the jury. In short, the trial court exercised no discretion, much less sound discretion, before declaring a mistrial.

We concede that our deferential review of the trial court's decision is somewhat hampered by the trial court's failure to make any factual findings before announcing an end to the trial. The trial court premised its decision on a letter suggesting the possibility that one juror might be biased in favor of defendant Henry. But that suggestion was pure hearsay. The juror who wrote the note—DK—indicated in it and later confirmed on the record that her information was not first-hand, but came from a second juror, TH. The trial court never questioned TH or otherwise attempted to verify that the note's allegations were accurate. Nor did the trial court

actually make any findings for the record. We find it equally disturbing that the trial court revoked defendant Henry's bond without making any finding that she had improperly spoken to a juror.

In *People v Lett*, 466 Mich 206, 221; 644 NW2d 743 (2002), the Supreme Court held that "[c]onsistent with the special respect according to the court's declaration of a mistrial on the basis of jury deadlock," a court is not required to examine alternatives, conduct a "manifest necessity" hearing, or make findings on the record. This case presents a markedly different situation. An appellate court reviewing a mistrial declared because of deadlock knows how long a jury deliberated before announcing that it was unable to reach a verdict, and can review the jury's communications with the court. In such cases, as in *Lett*, "the record provides sufficient justification for the mistrial decision." *Id*. at 218. In other contexts, however, the *Lett* Court acknowledged that an exploration of alternatives to mistrial might be required. *Id*. at 221 n 13.

The federal courts of appeal apply various factors when evaluating whether a mistrial was manifestly necessary. In the Court of Appeals for the First Circuit, for example, the inquiry is informed by: "(i) whether alternatives to a mistrial were explored and exhausted; (ii) whether counsel had an opportunity to be heard; and (iii) whether the judge's decision was made after sufficient reflection." *United States v Toribio-Lugo*, 376 F3d 33, 39 (CA 1, 2004). The Fourth Circuit has declared, "In order to determine if the mistrial was required by manifest necessity, the critical inquiry is whether less drastic alternatives were available." *United States v Shafer*, 987 F2d 1054, 1057 (CA 4, 1993). The Eighth Circuit considers "whether there were alternatives to a mistrial and whether the trial court gave the defense counsel an opportunity to explain his or her position on a mistrial[.]" *Huss v Graves*, 252 F3d 952, 955 (CA 8, 2001) (citation omitted). The Ninth Circuit applies four factors in determining whether manifest necessity existed:

> whether [the trial court] has (1) heard the opinions of the parties about the propriety of the mistrial, (2) considered the alternatives to a mistrial and chosen the course of action least harmful to a defendant's rights, (3) acted deliberately instead of abruptly, and (4) properly determined that the defendant would benefit from the declaration of mistrial. [*United States v Bates*, 917 F2d 388, 396 (CA 9, 1990).]

The Sixth Circuit has observed, "[T]he trial court's failure seriously to consider alternatives to declaring a mistrial further militates against a finding that manifest necessity warranted a mistrial." *Johnson*, 198 F3d at 595.

Common to all of these formulations are the notions that a court must consult counsel, consider whether a mistrial is the only course of action appropriate under the circumstances, and above all, proceed deliberately rather than hastily. The trial court ignored these obligations here. Its abrupt decision was fundamentally inconsistent with an exercise of sound discretion.

We need not specifically hold that the trial court was required to consider alternatives to a mistrial. The trial court's explanation for its decision evinces that it *did* consider at least one alternative to immediately declaring a mistrial—speaking with the jury to obtain more information—but misunderstood the law. Contrary to the trial court, a deliberating jury is not a

"sanctum sanctorum," and questioning jurors is not strictly prohibited. There is no court rule precluding a trial court from questioning a juror on the record, with counsel present, when possible misconduct is brought to the court's attention. Many published cases in this state have discussed the practice without criticism. See, e.g., *People v Tate*, 244 Mich App 553; 624 NW2d 524 (2001); *People v Messenger*, 221 Mich App 171; 561 NW2d 463 (1997); *Prentis v Michel* 368 Mich 182; 118 NW2d 34 (1962). Had the court determined that juror C was, in fact, biased, she could have been removed and the trial continued with less than 12 jurors on stipulation of the parties. MCR 6.410(A).

In addition to abusing its discretion by sua sponte declaring a mistrial, the trial court committed a serious legal error when it decided against conducting any investigation into the truth of the note. Instead, based on rank hearsay the trial court speculated that defendant and the juror had committed misconduct. Such speculation does not give rise to manifest necessity. As such, retrial was barred on double jeopardy grounds.

We reverse.

/s/ Elizabeth L. Gleicher
/s/ Stephen L. Borrello
/s/ Brock A. Swartzle